**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**


**DOUGLAS E. SMITHSON,**

     **Plaintiff,**

**vs.**                           **Case No.  5:10cv300-RS/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

     **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).   It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, Douglas E. Smithson, applied for disability insurance benefits and supplemental security income benefits.  His last date of insured status for disability benefits was March 11, 2011.  Plaintiff alleges disability due to plantar fascitis with swelling and pain in his feet,  with onset on April 14, 2004.  Plaintiff was 42  years of

age on April 14, 2004, has a 12th grade equivalency education, and has past relevant work as an automobile mechanic and as a correctional officer.

Plaintiff had two administrative hearings.  The second was the result of a remand by the Appeals Council.  In the second opinion under review in this court, the Administrative Law Judge found at step 2 that Plaintiff had a history of residuals of plantar fascitis with plantar fascitis release in August, 2004, and symptoms of left tarsal tunnel syndrome and subsequent left tarsal tunnel release surgery.  R. 16.  The ALJ found further that Plaintiff had the residual functional capacity to do a limited range of sedentary work, could no longer do his past relevant work, but could do sedentary work as a para-mutual ticket checker, a surveillance system monitor, and as an order clerk, and thus was not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.     Is the individual currently engaged in substantial gainful activity?

2.     Does the individual have any severe impairments?

3.     Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.     Does the individual have any impairments which prevent past relevant work?

5.     Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing[1]**

Plaintiff testified at the first administrative, held on March 9, 2007, that on April

14, 2004, while working as a correctional officer, he had to run down a hill behind a

dormitory to respond to a prison riot.  630.  Later, as he was doing reports, he noticed

severe pain in both feet.  Id.  He went to the doctor the next day and was diagnosed

with the impairments he now has.  Id.  He went back to work, and was transferred to a

work camp for a less strenuous position, but he found that he could no longer work as a

correctional officer due to pain in his feet.  R. 631.

Plaintiff said that after foot surgery, his feet improved initially and then the pain

gradually returned.  R. 634.  During this period, Plaintiff had physical therapy and

massage therapy from time to time, and wore a boot, which helped some.  R. 633-635.

He said that his left foot had always been worse than the right.  R. 634.  His right foot,

he said, was "pretty good," but his left foot "is severely painful."  R. 635.  Plaintiff said

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS' DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx, or PUBMED HEALTH, found at http://www.ncbi.nlm.nih.gov/pubmedhealth/, or EVERYDAYHEALTH, found at http://www.everydayhealth.com/drugs. Information about medical terms and prescription drugs come from MEDLINE PLUS (MERRIAM-WEBSTER), found at: www.nlm.nih.gov/medlineplus/mplusdictionary.htm or NATIONAL INSTITUTES OF HEALTH, found at: http://health.nih.gov.  The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

that he had had surgery first on his left foot and then on the right, and the surgery had helped on the right.  R. 637.  Plaintiff said he had last seen Dr. Merritt in February, 2007, and Dr. Merritt "put me on Vicodin[2] and he just told me that he's done the best he can."  R. 636.  He said that he experienced drowsiness from the Vicodin.  R. 650. He said that he did not tell Dr. Merritt that Vicodin caused sleepiness because "going to sleep is an advantage because I don't sleep at night."  R. 652.

Plaintiff said that he could walk for less than an hour after the first surgery.   R. 635.  At the time of the hearing, he said that he thought he could walk only 10 to 20 minutes before having to sit.  R. 639.  He said that he okuses a cane to walk on the recommendation of Dr. Merritt.  R. 647.  He said that "any kind of pressure put on my foot is super painful.  If I sit in an upright position with my feet down it's severely painful. If I try to walk it feels like a knife going through my foot so I try to stay off of it as much as possible."  R. 639.

Plaintiff said he sat most of the day, "probably eight hours a day most of the time."  R. 642.  He said that he sat with his foot elevated in a recliner.  R. 646-647.  He uses ice a couple of times a day to reduce swelling.  R. 648.

Plaintiff said he no longer has any recreational hobbies and he does not go to church.  R. 649.  He uses a chair in his shower.  R. 651.  He sometimes (once or twice a month) shops for groceries with his wife, using a motorized cart.  *Id.*

---

  [2]  Vicodin is a combination of acetaminophen (Tylenol) and the opioid pain medication hydrocodone used to treat moderate to moderately severe pain. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

Plaintiff said he did not have any problems with his back.  R. 639.  He also did not have any problems with his arms and hands, and he could lift 12 pounds from a seated position.  R. 646.  He said he could not carry anything because the weight causes too much pain in his left foot.  *Id.*  He said he could read and write, do simple math, write a short note, compile a grocery list, and had a valid driver's license, but did not drive much.  R. 624-625.  He drove with his right foot.  R. 643.  He said that he could drive 150 yards, to the mail box, or a mile, to his mother-in-law's home.  R. 648.

Plaintiff was taking testosterone injections once a month and Vicodin.  R. 640-642.  He said that Vicodin took the "edge" off the pain.  R. 641.  He said that without Vicodin, "I'd be in misery."  *Id.*

**Medical evidence**

Plaintiff was seen by a number of physicians after he began to experience foot pain while working as a correctional officer.  On August 25, 2004, he underwent surgical left tarsal tunnel release and left partial plantar fasciectomy by Andrew Borom, M.D.  R. 101.  Dr. Borom noted that conservative measures had not helped, and an MRI demonstrated substantial "involvement" of the origin of the plantar fascia.  *Id.*  Plaintiff underwent massage therapy eight times, from October 15, 2004, to January 13, 2005, with continued complaints of pain and tension in his feet, but the massages helped.  R. 123-129.

On October 21, 2004, Plaintiff was seen by George N. Merritt, D.P.M., for a second opinion.  R. 420.  Plaintiff said that his left foot still bothered him, and his right foot was getting worse.  *Id.*  Dr. Merritt noted pain and swelling of Plaintiff's left foot secondary to the surgery, and observed that Plaintiff's gait was antalgic.  *Id.*  X-rays

revealed bilateral heel spurs.  *Id.*  Dr. Merritt wanted Plaintiff to "get out of the boot on the left foot and try to get back moving and getting into shoes."  R. 421.

On January 25, 2005, Dr. Merritt again saw Plaintiff.  R. 417.  Plaintiff's left foot was still healing from the surgery, with pain, and his right foot was "still an issue."  *Id.*  On examination, Dr. Merritt found pain in Plaintiff's right foot.  *Id.*  Surgery for the right foot was discussed and scheduled.  *Id.*

On February 1, 2005, Plaintiff underwent surgery (an endoscopic plantar fasciotomy) on his right foot.  R. 413-414.  By July 25, 2005, Dr. Merritt said that Plaintiff's right foot was almost 100% healed and without pain.  R. 402.  Plaintiff told Dr. Merritt that his left foot still gave him problems, "especially when he is on it."  *Id.*  Dr. Merritt found that Plaintiff's left foot was swollen and tender.  *Id.*  Plaintiff said that at times it was more swollen than others, and he had to take the weight off the foot.  *Id.*

On March 7, 2006, Plaintiff had an MRI of his left foot.  R. 399.  The impression of Michael P. O'Neill, M.D., who read the MRI, was "some mild dorsal subcutaneous edema signal and soft tissue swelling identified throughout the left midfoot," but without any indication of underlying acute osseous abnormality, focal muscle tear, or tendon abnormality.  *Id.*

On March 14, 2006, Plaintiff had an MRI of his left ankle.  R. 397.  The result was the identification of chronic Achilles tendinosis with no focal tear or retraction, a small left ankle joint effusion, a small amount of fluid within the posterior tibialis and peroneus longus tendon sheath suggesting mild tenosynovitis, but the left ankle joint space was well-preserved.  R. 398.

On March 22, 2006, Plaintiff had NCV[3] and EMG[4] testing of his left foot.  R. 321. The testing was conducted by Kamel Elzawahry, M.D.  *Id.*  The NCV test produced "findings compatible with entrapment neuropathy and the clinical diagnosis of tarsal tunnel syndrome."  *Id.*  The EMG of the left lower extremity was normal.  *Id.*

On May 1, 2006, Plaintiff reported to Dr. Merritt that his pain was worsening.  R. 395.  At issue was Plaintiff's left foot.  Dr. Merritt contemplated additional surgery on the left foot, a tarsal tunnel release and a plantar fasciotomy, and planned to put Plaintiff's foot into a boot for two or three weeks.  *Id.*

Surgery was scheduled for June 6, 2006.  R. 394.  On May 31, 2006, Plaintiff again reported he was having problems with his left heel and ankle.  R. 392.  On June 6, 2006, Dr. Merritt performed the surgery, a revision left foot tarsal tunnel release and plantar fasciotomy.  R. 390.

On August 21, 2006, Plaintiff reported to Dr. Merritt that he was still having "quite a bit of pain in his left foot."  R. 383.  The pain in the heel was gone, but he had a burning pain in the ball of his left foot.  *Id.*  Plaintiff said that as long as he was on the couch with his foot elevated, "he does pretty good."  *Id.*  He said that he could "get around for an hour in the morning and an hour in the afternoon but he can't put in a full day standing and walking and doing the things that he'd like to do."  *Id.*  Dr. Merritt determined that most of the pain in Plaintiff's left foot was "in the arch and the ball of the

---

[3] Nerve conduction velocity testing.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[4] An EMG is an abbreviation for an electromyogram, an electromyograph, or an electromyography.  MEDLINE PLUS (MERRIAM-WEBSTER).

foot and on the side of his foot." *Id.* Dr. Merritt said he thought it would take six to eight weeks from the surgery to heal. *Id.*

On October 16, 2006, Plaintiff reported to Dr. Merritt that he was "doing much better." R. 380. He had had several physical therapy treatments, and he felt that he could go back to work and sit or do light duty without having to carry, stand, or walk. *Id.* Dr. Merritt determined that Plaintiff was still having a little pain in the arch of his left foot, but his ankle pain was gon and the swelling seemed much improved. *Id.* Plaintiff was to continue stretching, icing, and physical therapy. *Id.*

On October 17, 2006, Dr. Merritt wrote that he did not think that Plaintiff had yet reached maximum medical improvement, and could not be given an impairment rating yet, but he allowed him to return to light duty, that is, "no excessive ambulation, no carrying heavy objects greater than 20 pounds, no lifting, or bending, or stooping, and most of the job should consist of him sitting or doing a lit bit of walking." R. 379.

John Spence, M.D., a primary care physician, treated Plaintiff from April 7, 2003, R. 373, to November 6, 2006, R. 329. R. 328-374 (medical records). On November 7, 2006, Dr. Spence filled out a "sedentary requirements checklist." R. 324-327. He said that Plaintiff could not sit for 6 hours a day, stand for 2 hours a day, walk short distances, and could not be expected to attend employment 8 hours a day, 5 days a week. R. 324. He said that Plaintiff's pain was "virtually incapacitating." R. 325. He said that Plaintiff was "totally restricted and thus unable to function at a productive level of work." R. 326.

On November 27, 2006, Plaintiff returned to Dr. Merritt. R. 376. Plaintiff told Dr. Merritt that his right foot was "perfect" and his left foot was "stabilized." *Id.* Plaintiff said

that as long as he did not "do a whole lot," his left foot did not bother him.  *Id.*  He said

he used a cane to walk any distance.  *Id.*  He said that he experienced problems when

physical therapy had become more intense.  *Id.*  Dr. Merritt discussed the difficulties

Plaintiff had with returning to the demands of his work as a correctional officer, and said

that "the only thing left to do is to go on disability."  *Id.*  Dr. Merritt found that Plaintiff still

had "some discomfort" with diminished range of motion and strength in his left foot.  *Id.*

Dr. Merritt's diagnosis was "chronic plantar fasciitis, heel spur syndrome, tarsal tunnel

syndrom of the left foot with instability and gait abnormality."  *Id.*  Dr. Merritt thought that

he had done as much as he could for Plaintiff, except for palliative care, which included

Vicodin.  *Id.*

The "disability" at issue was pursuant to Florida's worker's compensation law.  R.

377-378.  On December 11, 2006, Dr. Merritt wrote a letter to the Florida Division of

Risk Management stating his opinion as to Plaintiff's functional limitations.  R. 425.  Dr.

Merritt wrote:

> He can stand maybe two hours for maybe 10 to 14 minutes at one time for
> a total of two hours for an 8-hour day.  He can sit the full eight hours and
> he can sit all at one time if he needs to.  As far as his walking he should
> limit that as well to maybe one hour during an eight hour day with half an
> hour perhaps in the morning and half an hour in the evening.

R. 425.  He said that Plaintiff had no restrictions for use of his right foot for foot controls,

but could not use his left foot except for short periods of time for operations not requiring

a lot of strength.  *Id.*  Dr. Merritt said that Plaintiff had no other restrictions for driving.

*Id.*  He said that Plaintiff had "painful ambulation."  *Id.*  He said that MMI was reached

on that date, and that the restrictions were permanent.  *Id.*  He found a 6% impairment

of the whole person.  *Id.*

On March 28, 2007, Dr. Merritt was deposed in connection with the worker's compensation claim.  R. 462-478.  Dr. Merritt said he had continued to provide treatment to Plaintiff.  R. 465.  Dr. Merritt said that Plaintiff's impairment was his left foot, that his right foot was "completely asymptomatic, and he's doing really good with the right foot."  R. 466.  He said that after the second surgery, Plaintiff was still having "significant discomfort and swelling" in his left foot.  *Id.*  Dr. Merritt said that Plaintiff's report that his left foot swells, and he has to elevate it and apply ice, when he has been on that foot for over 30 or 40 minutes, was consistent with his own examinations and the condition which Plaintiff suffers.  R. 467-468.  Dr. Merritt read into the record the restrictions that he found on December 11, 2006, described above, and he added that Plaintiff should "try to keep his foot elevated whenever sitting as much as possible so that we can keep the swelling down."  R. 468.  He said that the last time he had seen Plaintiff was on January 25, 2007, and Plaintiff was then still having pain when he walked and "was still having associated swelling problems."  R. 470.  He said that Plaintiff could not return to his job as a correctional officer.  *Id.*  He said that icing the foot would help reduce the swelling.  *Id.*  Dr. Merritt said that on his recommendation, Plaintiff participated in physical therapy.  R. 470-471.  He said that Plaintiff had done everything he had asked him to do to achieve the maximum level of recovery, and that he was "an exemplary patient."  R. 471.  Dr. Merritt had discontinued Vicodin, and said that Plaintiff was not then taking any narcotic pain medication, and had never attempted to obtain more pain medication than had been recommended.  *Id.*

When asked whether Plaintiff had the capacity to do work other than as a correctional officer, Dr. Merritt said that Plaintiff "can have a sedentary job with a

stipulation that he try to keep his foot elevated as much as possible."  R. 472.  He said

that he would need to elevate his foot "at least a couple of hours in the morning and at

least a couple of hours in the afternoon."  R. 472-473.  In other words, he said that he

would need to elevate his foot at least half the time during an eight hour work day.  R.

473.  Dr. Merritt said that ideally, Plaintiff should elevate his foot at heart level, "but I

realize that's not very practical at work.  "So if he's sitting down in a chair, he can have a

foot stool or something like that and try to elevate his foot at least so that it's horizontal

to the ground.  Any elevation is better than no elevation."  *Id.*  "So ideally above the

heart is ideal.  That's not going to happen.  So at least if he could prop his foot on a

stool next to him or something like that, that will help."  R. 473-474.

Dr. Merritt said that he accidentally left out the need to elevate the foot in his

December 11, 2006, explaining that that need was due to the fact that "he was still

experiencing swelling."  R. 473.  Dr. Merritt said:

> If we can get rid of the swelling – the unfortunate thing is that once
> swelling gets in and sometimes takes over and it's hard to get rid of the
> swelling.  Once it's there, it's there for a long time and we don't know if it's
> going to be permanent or not.  But if it – it may be permanent in which
> case the elevation is something that he's going to be restricted on.  If it
> goes away, then he won't need to be restricted in terms of elevation.

R. 475.  An attorney conducting the deposition then noted that according to the medical

records, Plaintiff had complained of swelling "for quite some time."  *Id.*  Dr. Merritt

explained that first Plaintiff had swelling after the surgery, but that now the swelling in

his left foot was chronic and he was still having swelling.  R. 476.  He again explained

that the longer Plaintiff experiences swelling, "the less chance of it going away," and

"we're just going to have to wait and see."  *Id.*

Also on March 28, 2005, James M. Talkington, M.D., conducted an independent

medical examination for the worker's compensation claim.  R. 306.  Dr. Talkington

examined Plaintiff and reviewed the records.  R. 306-307.  From a review of the

records, which indicated that Plaintiff had started to have problems with his feet before

the running incident at work, Dr. Talkington was of the opinion that Plaintiff's impairment

was a chronic degenerative condition.  R. 308-309.  On examination, Dr. Talkington

noted that Plaintiff was obese and walked with an antalgic gait with discomfort in both

lower extremities, with limited range of motion in both feet and pain in the left foot.  *Id.*

His diagnosis was status post surgery plantar fasciitis, greater on the left than the right.

R. 309.  He said that while it was unlikely that Plaintiff could return to his work as a

correctional officer, which requires prolonged walking and standing, he thought that

Plaintiff "should be retrained for a more sedentary position."  *Id.*  He assigned a 4% total

whole body impairment, 2% for each foot.  *Id.*

On February 1, 2007, Sheila G. Justice, a vocational expert, was deposed and

her vocational report was attached.  R. 426-434, 450-461.  Ms. Justice is a vocational

rehabilitation consultant.  R. 429.  Reviewing Dr. Merritt's December 11, 2006, opinion

and the medical records, she said that Plaintiff was capable of doing unskilled, semi-

skilled, and skilled sedentary work, and she identified a number of jobs he could do.  R.

454, 457.  She said: "If the treating physical [sic] indicates that the individual has to

elevate their [sic] foot, yes, it could conceivably change my opinion; but I would need to

know with what frequency, how often, and under what circumstances."  R. 432.  She

said that "if any individual has to elevate their foot during the majority of the course of a

workday, the sedentary physical demand level would be significantly eroded, and,

therefore, the sedentary labor market significantly eroded." R. 434. She said such an individual could work only in a "shelter-type situation." *Id.*

On April 3, 2007, the worker's compensation carrier determined that Plaintiff was permanently and totally disabled as of August 23, 2006. R. 479. The basis for that determination was not described.

On April 18, 2007, Plaintiff saw Dr. Merritt. R. 591. He was looking for a new house, and had been on his feet a lot. *Id.* His left heel was very tender to touch. *Id.* It was expected that he would be doing a lot of walking, and there was no mention of swelling in the foot. *Id.*

On August 21, 2007, Plaintiff was seen by Dr. Merritt. R. 590. He had moved his trailer to another lot and he "had been on his feet more than he's used to," and developed more pain in his left heel. *Id.* His foot was examined, and pain was produced on palpation. *Id.* There was no mention of swelling. *Id.*

On November 21, 2007, Plaintiff saw Dr. Merritt. R. 589. He was using Percocet for pain, and was about the same. *Id.* He still had pain in his left heel, but there was no mention of swelling. *Id.* On the same date, the only restrictions that Dr. Merritt placed upon Plaintiff's activities were to wear a foot and ankle brace and compression stockings. R. 598.

On February 25, 2008, Plaintiff was seen by Dr. Merritt. R. 588. Plaintiff said that his right ankle had given way as he went down stairs, even though he was using a cane. *Id.* Dr. Merritt said that with instability in the right ankle, he needed a Ritchie brace for the right ankle like the one on the left foot. *Id.* Dr. Merritt found that Plaintiff's heel was tender to touch, but there was no mention of swelling. *Id.*

On July 21, 2008, Plaintiff was seen by C. W. Koulisis, M.D., on a consultative basis.  R. 603.  Plaintiff told Dr. Koulisis that he could not walk without his braces because his ankles were unstable.  *Id.*  Dr. Koulisis noted that the pain was not radicular and Plaintiff had no other complaints of impairments.  *Id.*  His current medication was Percocet.[5]  *Id.*  Plaintiff was wearing bilateral Ritchie braces, and his gait was steady with the braces.  R. 603-604.  Plaintiff was asked by Dr. Koulisis to remove the Ritchie braces and, apparently, his support hose.  R. 604.  At that point, Plaintiff told Dr. Koulisis that he would not walk without his Ritchie braces.  R. 604.  Dr. Koulisis found that Plaintiff's left foot was "exquisitely globally tender" and Waddell's[6] was 5/5.  *Id.*  Dr.

---

[5] Percocet, a narcotic analgesic, is used to treat moderate to moderately severe pain.  It contains two drugs – acetaminophen and oxycodone.  Acetaminophen is used to reduce both pain and fever.  Oxycodone, a narcotic analgesic, is used for its calming effect and for pain.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[6] Waddell's sign is a sign for nonorganic pain.  Wick v. Barnhart, 173 Fed.Appx. 597, 599 (9th Cir. Mar 10, 2006) (not selected for publication in the Federal Reporter, No. 04-35579).

> "Waddell's signs" are a group of physical signs that may indicate a non-organic or psychological component to lower back pain.  Waddell's signs are also used to detect malingering or exaggeration in patients complaining of lower back pain.  *See* Waddell, Gordon; John McCulloch, Ed Kummel, Robert Venner (March/April 1980), "Nonorganic Physical Signs in Low–Back Pain," SPINE 5(2): 117–125.

Quesada v. Astrue, 2011 WL 4499006, *5 n.4  (S.D. Cal. Sep 26, 2011) (No. 10-CV-1139-JM POR).  "Malingering is not the only conclusion to be drawn from the exhibiting of Waddell signs."  Hilmes v. Barnhart, 118 Fed.Appx. 56, 61 (7th Cir. Aug 24, 2004) (not selected for publication in the Federal Reporter, No. 03-4262).

> It is true that the test is an aid, but it is not definitive. *See Nonorganic Physical Signs in Low-Back Pain*, Waddell, et al., *Spine*, vol. 5, 1980 (The test helps clarify the assessment of purely physical pathological conditions); *Behavioral Responses to Examination: A Reappraisal of the Interpretation of "Nonorganic Signs"*, Main and Waddell, *Spine*, vol. 23, 1998 ("Behavioral signs are not on their own a test of credibility or

Koulisis decided that Plaintiff was "not forthcoming during the examination and it was terminated at this point."  *Id.*  He noted that x-rays bilaterally of Plaintiff's ankle and calcaneus "reveal no bony abnormalities" and were "largely unremarkable."  *Id.*  On the same date, Dr. Koulisis filled out a residual functional capacity form.  R. 608.  He indicated on the form that he thought that Plaintiff could continuously lift and carry 100 pounds, sit, stand, and walk each for 8 hours a day, did not need a cane to walk, and had no limitations at all.  R. 609-613.

At the second administrative hearing on November 3, 3008, the ALJ took telephonic testimony from Charles Hancock, M.D., a board certified orthopedic surgeon. R. 663.  Dr. Hancock's role was that of a physician who reviewed the medical records, but did not examine Plaintiff.  R. 665.  Dr. Hancock said he could find nothing in the medical records to indicate that Plaintiff's ankles were unstabl, or that he could not walk without braces.  R. 667.  He said "I'm not sure I know what the braces are doing, since we don't have any demonstrated ligamentous or neuromuscular instability."  R. 668.  He noted that Dr. Merritt had recommended a Ritchie brace, and he was not familiar with it. *Id.*  Dr. Hancock said he could not find any evidence in the medical records of venous stasis issues to cause continued swelling of his foot.  R. 671-672.  He saw no need in the records for Dr. Merritt to have limited Plaintiff in his ability to bend or stoop.  R. 675-

---

faking.").

Donaldson v. Astrue, 2009 WL 3161698, *10, n. 4 (N.D. Fla. Sep 28, 2009) (No. 3:08CV386/MCR/MD).

676.  He said that if Plaintiff still had swelling of his foot, he would need to elevate his

foot, but he had never seen postoperative swelling last four years.  R. 676.  He said that

postoperative swelling usually lasts only three or four months.  R. 680.  Dr. Hancock

said that if Plaintiff was not up and walking around, he might have swelling and might

need pressure gradient stockings to move the blood back up his legs.  R. 677.  He said

that he saw no evidence of venous thrombosis, inadequate vasculature, or Doppler

readings as objective evidence of a cause of continued swelling.  *Id.*  He said that he

saw no reason to have venous swelling, other than that Plaintiff was overweight, but his

weight did not "seem to be affecting the right side."  R. 678.  Dr. Hancock then

suggested immobilization with a walking brace as a treatment modality.  *Id.*  But he said

he did not know why Dr. Merritt put Plaintiff into a Ritchie brace.  R. 680-681.  Dr.

Hancock said there was "no reason in the world" that Plaintiff could not sit.  *Id.*  He said

that if Plaintiff still had swelling of his left foot, he would limit him only occasionally to

climb stairs, but with good, rigid support, thought Plaintiff could stand and walk for six

hours a day.  R. 685.  He said he thought that Plaintiff could occasionally lift and carry

20 pounds and frequently lift 10 pounds.  *Id.*  He said that if Plaintiff currently has

swelling, he should elevate his foot as high and as much as possible within the limits of

his work.  R. 686-687.  He said that if Plaintiff did not have any blockage, he would put

him on some pressure gradient hose and do away with the elevation of the foot

requirement.  R. 687.  Dr. Hancock agreed that a treating physician is more qualified to

determine a patient's restrictions than a physician like himself, who did not treat or exam

Plaintiff.  R. 690.

After Dr. Hancock testified, Plaintiff testified that Dr. Koulisis asked him to walk without braces, and he told Dr. Koulisis it was too painful to do so, and "he just, he ended it right then.  That was it.".  R. 692.  Plaintiff said he was wearing both braces and compression hose for both legs, just as Dr. Hancock had suggested.  *Id.*  He had been wearing both for two to three years.  *Id.*  He had had problems with his left ankle giving way, and that is why he had the brace on his left foot.  *Id.*  He did not mention any continued swelling of his foot.  *Id.*

Another vocational expert, Charles Heartsill, testified that if Plaintiff had to work from a seated position with his left leg elevated to heart level, he would be in a reclining position.  R. 698.  He knew of no jobs in the national economy that are performed in a reclining position.  *Id.*

In response to argument from Plaintiff's representative, the ALJ said he was not giving any weight to the residual functional capacity opinion of Dr. Koulisis.  R. 699.  He did not think that Dr. Koulisis's opinion, that Plaintiff no work limitations at all, was reasonable.  R. 700.

**Legal analysis**

### Whether the ALJ erroneously failed to give substantial weight to the opinions of treating physicians

Plaintiff contends that the ALJ erred by failing to give substantial weight to the opinions of treating physicians, Dr. Spence and Dr. Merritt.  Doc. 15, p. 24.

The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Winschel v. Commissioner of Social

Sec., 631 F.3d 1176, 1179 (11th Cir. 2011).  "The Secretary must specify what weight is

given to a treating physician's opinion and any reason for giving it no weight, and failure

to do so is reversible error."  MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir.

1986).  The reasons for giving little weight to the opinion of a treating physician must be

supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir.

1992), and must be clearly articulated.  Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th

Cir. 2004).

Plaintiff argues that the ALJ failed to give good reasons to accept Dr. Merritt's

opinion that Plaintiff was "permanently and totally disabled."  Doc. 15, p. 24.  It appears

that when Dr. Merritt said that Plaintiff should "go on disability," he was referring to

disability for purposes of returning to Plaintiff's former work.  R. 376-378.  It is plain that

Dr. Merritt did not think that Plaintiff was incapable of doing any kind of work since he

testified that he thought that Plaintiff could do sedentary work.  This argument,

therefore, is unpersuasive.

The Administrative Law Judge effectively gave substantial weight to most of Dr.

Merritt's opinion, that Plaintiff can do sedentary work.  R. 22.  He said: "The

undersigned has accepted the limitation [found by Dr. Merritt] on his ability to sit for at

least up to 6 hours or more in a[n] 8 hour work day."  Id.  He also agreed with Dr. Merritt

that Plaintiff could walk for up to 2 hours in a workday.  Id.  He noted that the ability to

do sedentary work had been endorsed by Drs. Talkington, Koulisis, Hancock, and all of

Plaintiff's orthopedic surgeons.  Id.  He concluded: "Clearly, it is undisputed that this

claimant can do the sitting associated with such sedentary work."  Id.  He also agreed

that Plaintiff should be limited to no more than 2 hours a day of standing due to his

obesity and because "the claimant can be expected to have increased pain and discomfort with prolonged standing and walking and this restriction appears quite legitimate based upon the claimant's complaints associated with such prolonged standing and walking as are detailed in Dr. Merritt's progress notes." *Id*.

The only relevant point of contention presented to this court is the degree to which Plaintiff would need to elevate his left leg and the effect that having to elevate his left leg might have on his ability to do sedentary work.  As to the evidence of a continued to elevate the leg, the ALJ reasoned that Dr. Merritt's conclusion that Plaintiff's foot swelling was due to poor circulation after the surgeries was not supported by physical examinations, and an earlier Doppler study showed no evidence of any blockages.  R. 22.  He also found that "many post surgical exams showed his feet to be neurovascularly intact with good capillary refill which is not supportive of a conclusion that he lacked circulation in his lower extremities." *Id*.  The ALJ wrote: "The undersigned observed very few notations of swelling in this claimant's feet apart from those that might be routinely expected after he underwent a surgical procedure." *Id*.  He thought that Plaintiff might have only occasional swelling.  *Id*.

Plaintiff argues that the medical record contradicts these findings, and that swelling in Plaintiff's left foot was repeatedly noted in the medical record, and Dr. Merritt testified in his deposition that Plaintiff continued to suffer swelling as late as January 25, 2007.  Doc. 15, pp. 25-26, citing R. 387, 402, 418, 419, 420, 466-471, 473, 475-476.

Swelling was noted on October 21, 2004, (R. 420), November 11, 2004, (R. 419), December 9, 2004, (R. $18), July 5, 2006, (R. 387), and on July 25, 2006, (R. 402). Each of these notations, however, occurred in the months immediately after one of the

three surgeries, and was post-surgical swelling, as explained by both Dr. Hancock and Dr. Merritt. These notations are not evidence of chronic swelling.

The additional record citations, R. 466-471, 473, 475-476, are to the deposition of Dr. Merritt, taken on March 28, 2007. Dr. Merritt said that as late as the last time he had seen Plaintiff, on January 25, 2007, Plaintiff's left foot was swollen. R. 470. This was about eight months after the second left foot surgery.[7] Dr. Merritt testified that this swelling was no longer post-surgical swelling, but was chronic swelling. R. 476. However, Plaintiff was seen by Dr. Merritt after this deposition, on April 18, 2007, (R. 591), August 21, 2007, (R. 590), on November 21, 2007, (R. 589), and on February 25, 2008, (R. 588), and Dr. Merritt did not note any swelling in Plaintiff's feet on any of those examinations.

Thus, the ALJ's determination that Plaintiff is now beyond the post-surgical stage, and no longer experiences anything except occasional swelling in his left foot, is supported by substantial evidence in the record. While other conclusions could be drawn from this evidence, this court must affirm if there is substantial evidence in the record to support the ALJ's conclusion. The lack of any mention of swelling in Dr. Merritt's examination notes from April 18, 2007, to February 25, 2008, is substantial evidence. Consequently, his conclusion, somewhat contrary to that of Dr. Merritt in his the deposition on March 28, 2007, that Plaintiff has the residual functional capacity to do sedentary work without having to frequently elevate his left foot, is supported by substantial evidence in the record.

---

[7] The last surgery was on June 6, 2006. R. 390.

This determination has a significant impact upon whether this court should affirm the ALJ's determination that Plaintiff's capacity to do sedentary work is not significantly impaired by some need to elevate his foot while seated.  Plaintiff argues that the ALJ should have found that he had a need to elevate his foot at least 4 hours a day, and that Ms. Justice, the vocational expert, testified that such a requirement would significantly erode the sedentary job base.  Doc. 15, pp. 24-25.  Dr. Merritt testified that Plaintiff would need to elevate his foot at least half the time during an eight hour work day.  R. 473.  That, however, was on March 28, 2007, and the ALJ's conclusion that Plaintiff did not experience significant chronic swelling after that is supported by substantial evidence in the record.  Consequently, while the ALJ did not so find, it would follow that Plaintiff's need to elevate his foot due to some swelling has diminished to less than four hours a day, and thus the sedentary job erosion envisioned by Ms. Justice would not apply.

For all of these reasons, the ALJ did not err in the manner in which he relied upon and partially rejected the opinions of Dr. Merritt on his March 28, 2007, deposition.

The ALJ also rejected the opinion of Dr. Spence.  R. 23.  The ALJ said that the functional limitations assigned by Dr. Spence were not supported by his own progress notes.  *Id.*  Plaintiff has pointed to several places in Dr. Spence's records as supportive of Dr. Spence's residual functional capacity assessment.  Doc. 15, p. 29, citing R. 329, 240, 241, 345, 348, 357, 370, 371.  Many of these observations occurred before Plaintiff had had the three surgeries.  In some, Plaintiff's "chief complaint" did not involve foot pain.  At most, Dr. Spence found that Plaintiff had persistent foot pain or severe plantar fasciitis in one foot.  The last observation was on November 6, 2006, R. 329, still quite

close in time after the third foot surgery.  Consequently, it was reasonable for the ALJ to

conclude that Dr. Spence's records did not support his conclusion that Plaintiff was

completely incapable of doing work.[8]

Further, the ALJ rejected Dr. Spence's opinion as contradicted by Dr. Merritt's

opinion that Plaintiff had the functional capacity to sit for 6 hours and stand for 2 hours.

R. 23.  Dr. Merritt's opinion, the opinion of a treating physician who specializes in foot

medicine, was substantial evidence in the record to discount the functional capacity

assessment of Dr. Spence.

For these reasons, the ALJ gave adequate reasons to explain his analysis of the

opinions of Dr. Merritt and Dr. Spence.  He gave appropriate weight to the opinion of Dr.

Merritt, and properly did not give weight to Dr. Merritt's opinion.

### Whether the ALJ erred by not giving appropriate weight to the determination that Plaintiff is disabled under Florida workers' compensation law

A finding of total disability by Florida's workers' compensation agency is entitled

to great weight unless the ALJ gives good reasons for not doing so.  Falcon v. Heckler,

732 F.2d 827, 831 (11th Cir. 1984; Bridges v. Astrue, 2011 WL 549715, *7 (M.D. Fla.

Feb 08, 2011) (No. 5:09-CV-498-OC-JBT); Peel v. Astrue, 2009 WL 3028300, *7 (N.D.

---

[8] This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Winschel, *supra*, 631 F.3d at 1179; Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.").  *See also*, Crawford v. Commissioner Of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the treating physician's opinion).

Fla. Sep 17, 2009) (No. 508CV173/RS-EMT).  But even if the ALJ errs in failing to give

specific reasons to discount the workers' compensation finding, the error is harmless if

the impairments that are the basis for the workers' compensation finding have been fully

discussed by the ALJ.  Peel v. Astrue.

The ALJ noted that the state workers' compensation authority had concluded that

Plaintiff was disabled since 2006.  R. 23.  The ALJ said that he gave "no weight

whatsoever" to this finding "as there is no expressed rationale by this state agency that

would allow the undersigned to determine how this opinion was reached."  *Id.*

The ALJ gave an adequate reason to discount the workers' compensation

determination.  The evidence of the determination provides no basis for the conclusion

of total disability.  The workers' compensation finding is terse.  The form indicates that

Plaintiff was found to be "PTD" effective on August 23, 2006, which is assumed to mean

permanently totally disabled.  R. 479.  Moreover, the total disability conclusion is at

odds with the evidence before the workers' compensation authority.  On December 11,

2006, the treating physician, Dr. Merritt, wrote a letter to the Florida Division of Risk

Management stating his opinion as to Plaintiff's functional limitations:

> He can stand maybe two hours for maybe 10 to 14 minutes at one time for
> a total of two hours for an 8-hour day.  He can sit the full eight hours and
> he can sit all at one time if he needs to.  As far as his walking he should
> limit that as well to maybe one hour during an eight hour day with half an
> hour perhaps in the morning and half an hour in the evening.

R. 425.  These are not "totally disabled" limitations.  Further, Dr. Merritt said that MMI

was reached on that date, and that Plaintiff had a 6% impairment of the whole person.

*Id.*  Dr. Talkington assigned a 4% total impairment rating.  Neither is evidence of total

impairment.

Finally, as the court found in <u>Peel v. Astrue</u>, the ALJ fully discussed the one impairment that was implicitly at issue before the workers' compensation authority, Plaintiff's left foot.  His determination, that Plaintiff's left foot impairment did not preclude sedentary work, is supported by substantial evidence in the record.  Hence, if there has been error, it was harmless.

### Whether the ALJ erred in the evaluation of Plaintiff's subjective complaints of pain

Plaintiff contends that the ALJ erred in his evaluation of his pain testimony.  "If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so."  <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated by the ALJ for disregarding the claimant's subjective testimony must be based upon substantial evidence.  <u>Jones v. Department of Health and Human Services</u>, 941 F.2d 1529, 1532 (11th Cir. 1991).

The ALJ determined that the medical record did not fully support Plaintiff's complaints.  R. 20.  He pointed to evidence both before and after the surgeries that indicated that Plaintiff's physical problems with his feet were less than should be expected to cause the pain reported.  The ALJ noted that on September 8, 2003, while Plaintiff had plantar fascia tenderness, he was found to have full strength, there was no evidence of instability, and x-rays revealed only mild spur formation in the heels.. *Id.* These findings are supported by substantial evidence in the record.  T. 114.  The ALJ noted that on January 16, 2004, a right lower extremity Doppler study did not show any evidence of deep vein thrombosis.  R. 20.  This finding is supported by substantial evidence in the record.  R. 356.

The ALJ noted that after massage therapy for a period of time, Plaintiff had decreased tension and spasms, and felt better.  R. 20.  This finding is supported by the record.  R. 124-129.

The ALJ noted that on July 28, 2004, the chiropractor,  Dr. Steiger, observed that Plaintiff had an unremarkable gait and had no trouble getting onto and off the examining table.  R. 20.  This is supported by substantial evidence.  R. 157.  The ALJ noted that Dr. Steiger found that Plaintiff could walk without assistance on October 20, 2004, and Plaintiff reported that his neck and back symptoms had improved with care by a chiropractor and massage therapy, R. 20, and these findings are supported by the medical record.  R. 139.

The ALJ noted that on August 10, 2004, radiographs of Plaintiff's heels showed no osseous abnormalities.  R. 20.  This finding is supported by substantial evidence in the record.  R. 107.  The ALJ noted that on November 23, 2004, after the first surgery for the right foot, Plaintiff had been "full-weight bearing."  R. 20.  This finding is supported by substantial evidence in the record.  R. 98.  The ALJ noted that on March 22, 2006, Dr. Elzawahry administered EMG and NCV tests, and the NCV showed subtle changes consistent with incipient tarsal tunnel syndrome and the EMG was unremarkable.  R. 20.  This finding is supported by substantial evidence in the record. R. 320.

Finally, while not explicitly a part of the ALJ's consideration of Plaintiff's pain testimony, the ALJ's analysis of and reliance upon Dr. Merritt's opinion evidence, which established Plaintiff's ability to sit for long periods of time and to stand for shorter periods of time, was substantial evidence to conclude that Plaintiff's testimony as to

disabling pain was not credible to the degree alleged.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991) (treating physician's opinion that the claimant could do sedentary work was substantial evidence to discredit the claimant's pain testimony); Aurednick v. Sullivan, 733 F.Supp. 1460, 1463 (M.D. Fla. 1990) (same).  In summary, the ALJ did not err in his evaluation of Plaintiff's pain testimony.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge were based upon substantial evidence in the record and correctly followed the law.  The decision of the Commissioner to deny Plaintiff's application for benefits should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on October 13, 2011.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**